FILED
CLERK
10/5/2026 3:22 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
ANGEL JESUS ALMONTE,

Petitioner,

v.

KEN GENALO, New York Field Office Director, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, *et al*.

Respondents.

---------------------------------------------------x

**MEMORANDUM & ORDER**
Civil Action
No. 26-3633 (GRB)

**GARY R. BROWN, United States District Judge:**

In countless ICE habeas petitions involving individuals detained for civil—not criminal—proceedings, respondents advised judges of this court that various petitioners had been jailed due to misidentification: officers erroneously identified the petitioner as a "target" of an ICE "operation" based on similarities of height, weight, description, and sometimes a photograph. The undersigned has, in prior cases, accepted this explanation based on representations of counsel and/or sworn statements by ICE agents. This case required exploring that proffered justification in connection with two such non-criminal arrests.

In the subject ICE operation, a team working in the Bronx was attempting to arrest two "targets," individuals who had failed to appear after entry of a final order of removal. Instead, the ICE team mistakenly arrested two individuals, the petitioner and an American citizen, in dramatic, aggressive confrontations.

Agents allegedly arrested petitioner based on a physical description and photograph of one target. Yet the description disproves the match: the target was *five inches shorter* and *80 pounds lighter* than the petitioner. As to the photograph, the team leader acknowledged upon cross-examination that "it's very easy to see they're two different people." Trying to legitimize petitioner's arrest, ICE issued a post-hoc sworn administrative warrant containing false information and later issued a Notice to Appear. At the hearing, the officers proffered inconsistent, false and misleading testimony.

The result is troubling: compelling evidence here belies the ICE agents' reflexive invocation of misidentification as an excuse for erroneous arrests. Particularly problematic in this case, the evidence suggests that ICE attempted to support their unsupported misidentification argument through false or misleading documentation and testimony. The claims of misidentification here prove baseless, the arrests were procedurally deficient and legally invalid, and ICE agents falsified official records trying to conceal their illegal actions, which included significant injury to a U.S. citizen.

The arrest and detention of petitioner were illegal. The petition must be granted. Furthermore, given the false testimony and records supplied to the Court and the other matters revealed, further action must be considered.

**PROCEDURAL HISTORY**

On June 16, 2026, petitioner filed an emergency habeas petition challenging his arrest, detention and the conditions of confinement. Docket Entry ("DE") 1. That same

day, the Court issued an Order to Show Cause, and respondents filed an initial response to the petition on June 17, 2026, offering a factual proffer and several exhibits to oppose the petitioner's release on bail. DE 7. Petitioner filed a response on June 19, 2026, and the Court scheduled a factual bail hearing for June 26, 2026. DE 8; Electronic Order dated June 22, 2026. Respondents supplemented their response by letter dated June 24, 2026 and petitioner submitted a reply the following day. DE 10 to 14. The bail hearing was held as scheduled, at which three ICE officers and the petitioner testified. Tr. of Proceedings dated June 26, 2026 ("Tr.").

Following the hearing, the Court directed the release of petitioner on bail. Electronic Order dated June 26, 2026. The parties provided several post-hearing submissions, some in response to questions by the Court, and completed briefing the petition. DE 17, 20 to 22. This opinion follows.

**FACTS**

The following facts are drawn from the evidence adduced at the hearing, pre- and post-hearing filings and review of video evidence identified by the parties.

*The May 6, 2026 ICE Operation*

At the hearing, three ICE officers testified about ICE's May 6, 2026 "operation." *See generally* Tr. The hearing documented the relative inexperience of the officers involved: Team Leader John Katepodis worked for two years as a Deportation Officer, and other than serving as a dispatcher with the NYPD, he had no prior law

enforcement-related experience.[1] Tr. 89–90. Deportation Officer Kevin Brodowsky, assigned to ICE's Fugitive Operations Unit, worked as an ICE deportations officer since only September 2025 and had under two years' experience as a Customs & Border Patrol officer. Tr. 43–44. Deportation Officer Zamir Yassin, also assigned to ICE's Fugitive Operations Unit, had served as a Deportation Officer for only eight months and had several years' experience as a Customs & Border Patrol officer. Tr. 5–6.

The three officers all advised that, at about 3 p.m., they began surveillance at the Bronx apartment building in which the petitioner resided, searching for a target named Dario Santos-Amarante ("Dario"). Tr. 9. According to the testimony, Dario was wanted in connection with a removal order and had some "criminality" in his background. D.O. Yassin recalled "possible charges" against Dario, though he could offer no further detail, explaining that the "op plan" was "blunt" and "straight to the point." Tr. 15. According to D.O. Brodowsky, the subject criminality consisted of "drug charges." Tr. 45. Katepodis testified that, though he could not recall all of Dario's criminal charges "one of them was he resisted the officers." Tr. 90–91.

Records reveal that Dario's criminal history consists of several motor vehicle charges stemming from an incident on April 20, 2026, which included misdemeanor charges for reckless endangerment and fleeing from an officer. DE 20-3. There were no drug charges. *Id.*

---

1 Notably, NYPD dispatchers are classified as civilian employees, rather than law enforcement officers. *See Civilian Employees*, New York City Police Department, https://www.nyc.gov/site/nypd/careers/civilians/civilians-landing.page [https://perma.cc/QR4Y-FRK6].

Three unmarked vehicles, carrying at least five ICE officers, proceeded to the "target location" on Hull Avenue in the Bronx. Tr. 10–12. They parked on the street, establishing a surveillance that lasted between 30 minutes and one hour. Tr. 13.

Based on the agents' receipt of a text from supervisory officers, a second target, Kewin Santos-Amarante ("Kewin"), was added to the operation soon after the agents arrived at the scene. Tr. 13–14, 51, 93. They learned about Kewin via texts they received on their cell phones. *Id*. The officers were unaware of the nature of the relationship between the two targets. Tr. 13–14, 116. Kewin was being sought only for a failure to appear at an immigration office and had no criminal record. Tr. 90–93. However, Yassin testified recalling there were "possible charges" against Kewin, though he could not remember the nature of the charges. Tr. 14.

*Alleged Misidentification of the Petitioner as Kewin*

As part of the notification, a photograph of Kewin was provided by text to the officers. Tr. 14–15. Team Leader Katepodis conceded that a comparison of the photo of Kewin to one of the petitioner reveals that "it's very easy to see they're two different people." Tr. 112.

The officers provided conflicting testimony as to whether they had a physical description beyond the photograph of Kewin. D.O. Yassin, situated closest to the petitioner's residence, recalled knowing generally that the target had "a slender build [and was] a taller individual," though he again complained of the conclusory nature of the op plan. Tr. 16, 18. D.O. Brodowsky, in a car along with Katepodis located 100 feet away from the petitioner's residence, stated that the agents had a precise height and

weight of the target at the time of the encounter, though he could not recall these numbers at the time of the hearing. Tr. 85–86. Brodowsky recalled that the description identified Kewin as being Dominican. *Id.* Meanwhile, Team Leader Katepodis testified that although the height and weight of the target individual was available in ICE's Eagle database, the field agents did not have access to that system, and thus they did not have a description of the target. Tr. 94–5, 120.

The officers testified that they saw the petitioner exit the target location, remaining outside. Tr. 19. They watched him for 30 to 45 minutes. *Id*.

D.O. Yassin testified that he advised the team leader that petitioner was a "possible tango," meaning a match for their target. Tr. 17. Brodowsky recalled only that the target's description "was similar" to the petitioner's build. Tr. 86. Brodowsky stated he principally relied on Yassin's observations to identify the petitioner, though claimed he checked the photo of Kewin on his phone from 100 feet away to make a positive identification. Tr. 76–77.

ICE's "Record of Deportable/Inadmissible Alien," known as an I-213, contains a physical description of the petitioner: he is six feet tall (well above average height) and weighed 180 pounds (normal for that height) at the time of the arrest. DE 17-1 at 1. At the Court's direction, respondents also provided an I-213 for Kewin, with whom the agents purportedly confused petitioner. DE 17-4. According to that record, Kewin stands five foot seven inches tall (below-average height for a man in the United States) and weighed 110 pounds (significantly underweight for that height). *Id.* at 1. Thus, petitioner, a tall man with an average build, was five inches taller and 80 pounds

heavier than the target of the operation, who was a short, underweight individual. Nevertheless, the I-213 for petitioner states that these officers "*observed a male with the same build and likeliness as [Kewin] SANTOS-AMARANTE*." DE 17-1 at 1.

*Purported Narcotics Activity by Petitioner*

The officers testified that, during their surveillance, they observed the petitioner engage in hand-to-hand drug transactions. D.O. Yassin, closest to the petitioner and in the best position to observe, approached the topic with some degree of reticence, stating that during 30 to 40 minutes of observation:

> It does look like or it did appear that he was making some type of transactions with individuals, other people coming in and out of the houses. He was on the sidewalk briefly, and he would go right back into the curtilage of the fence.

Tr. 19. Asked if he was implying that these were drug transactions, Yassin explained:

> I want to say it's very possible. I'm not -- he -- he was -- it was quick. It looked like he was accepting something in his hand and giving something back to somebody.

Tr. 23–24. Yassin, with the best view, stated that these transactions were "very quick and subtle" and that "I did not actually see anything in his hand." Tr. 24.

By contrast, D.O. Brodowsky, 100 feet away and without the aid of binoculars (even though he had a pair available to him), not only testified to witnessing the transactions, but testified that "they were selling drugs," claiming he could see "baggies" being exchanged for money. Tr. 52–54, 77–78. Brodowsky further testified that his training enabled him to recognize this activity as narcotics transactions. Tr. 55.

Both Yassin and Brodowsky reported that the petitioner returned to the house between some of the transactions. Tr. 25.

Team Leader Katepodis, seated next to Brodowsky in a car 100 feet away from the petitioner, testified that he "saw him basically coming in and out of the address and basically doing a drug exchange with individuals that was [*sic*] coming in and out of the address." Tr. 95. Notwithstanding the differences in their accounts, each provided a nearly identical estimation of the number of transactions observed. Tr. 25 (Yassin approximated eight transactions); Tr. 55 (Brodowsky observed "eight or nine" drug transactions"); Tr. 125 (Katepodis testifies observing "8 to 10" drug transactions).

The I-213 does not contain mention, reference or hint to the supposed observations by three ICE officers of the petitioner engaging in a score of hand-to-hand drug deals immediately before his apprehension. DE 17-1. In fact, the report affirmatively states that "ALMONTE was not in possession of any funds at the time of arrest." *Id.* at 4. This fact is confirmed by the property receipt issued to the petitioner, which demonstrates an absence of cash, drugs or anything that could be construed as drug paraphernalia or supplies related to narcotics distribution. DE 17-2. When asked by the Court whether he or his team reported their identification of illegal narcotics operation to the NYPD, Katepodis—a former NYPD dispatcher—stated:

> Sir, we don't have the best relationship with NYPD, so I don't know how that would work.

Tr. 126. Respondents made no reference to these supposed observations prior to the bail hearing; in fact, Government counsel had previously confirmed that there was no

information that the petitioner had any "involvement with illegal narcotics, violence, criminal history, firearm, gang affiliations and the like." DE 7 at 1. Nonetheless, during the hearing, Government counsel adopted these assertions as a basis to deny bail. Tr. 152.

*Arrest of the Petitioner*

D.O. Yassin testified that, after getting approval via radio from Team Leader Katepodis, along with one or more other officers, he approached the petitioner, saying "Hello, sir. We'd like to ask you a couple of questions." Tr. 20. At that point, D.O. Yassin advised, "petitioner then darted down the — or started running down the street." *Id.* Petitioner testified that, when they approached him, the ICE agents "went for their weapons, that's when I started running." Tr. 131. All three officers deny doing so. Tr. 20, 57, 103.[2]

A brief foot chase followed. The end of that pursuit is captured on two videos, which depict a team of four or five masked ICE agents in tactical gear "taking down" the petitioner on the sidewalk, handcuffing him, lifting him off the ground and hustling him into a vehicle.[3] Tr. 60. Brodowsky and Katepodis took the lead in pursuing the

---

2 Because the ICE officers' testimony established independently and conclusively that petitioner's arrest was legally invalid, the Court was not required to credit petitioner's testimony in order to decide the petition. And the Court does not, in fact, rely on petitioner's testimony to adjudicate any disputed facts. On this point, ICE's treatment of Concepcion discussed *infra* provides inferential support for petitioner's claim that the officers unholstered their firearms.

3 Ex. E; Norwood News, *ICE Arrest on Decatur Avenue in Norwood, The Bronx, May 6, 2026* (YouTube, May 11, 2026),

petitioner, and Katepodis applied the handcuffs. Tr. 58–59. He was handcuffed behind his back and seat belted into the car, which was filled with officers. Tr. 67.

With the petitioner so restrained, the officers drove back to the site of the surveillance, returned to their respective vehicles, and, as the chase had attracted neighborhood attention, opted to transport petitioner to a nearby gas station deemed a "safe zone." Tr. 68–69. Petitioner was kept restrained and seat belted in the vehicle, which was surrounded by officers, while Katepodis conducted a "field interview." Tr. 72–73.

Katepodis, having incorrectly decided petitioner was lying about his name, testified he realized at the end of the field interview that, in arresting the petitioner, the agents had apprehended "the wrong person." Tr. 113; 124. Katepodis contacted a supervisor, noting the circumstances but indicating that the petitioner "did self-admit to being in the United States illegally." Tr. 101. The supervisor advised Katepodis via telephone that he would "issue the I-200 for his arrest," even though no NTA had been issued for the petitioner. Tr. 102–3. Relying solely on the "verbal approval of the I-200" by telephone, Katepodis informed the petitioner that "[h]e's under arrest by immigration," even though he had already been arrested and detained for some time. Tr. 102–3; *compare id. with* Tr. 63 (Brodosky describing site where petitioner tackled and

---

https://www.youtube.com/watch?v=3EQUDyHHX0I; Natalie Hernandez, *ICE Investigation in Norwood Ends in 2 Arrests; One Man Claims Mistaken Identity*, News12 The Bronx, https://bronx.news12.com/2026/05/08/ice-investigation-in-norwood-ends-in-2-arrests-one-man-claims-mistaken-identity/3tEjPD7fxF0DOBhWxNlOVA [http://perma.cc/AS3P-3VFM].

cuffed as where "we conducted the arrest"), *and* Tr. 39 (Yassin describing video of takedown as "when he was arrested"). Katepodis still did not have a warrant, and indeed, was aware that neither a warrant nor NTA had yet been issued. Tr. 103. Nevertheless, he continued to detain petitioner, ultimately transporting him to 26 Federal Plaza for processing. Tr. 107.

*Post-Arrest Actions by ICE Regarding the Petitioner*

After arresting petitioner without a warrant, ICE issued a post-hoc sworn administrative warrant. The arrest warrant purportedly established petitioner's lack of immigration status through "a record check of federal databases" and "biometric confirmation of the subject's identity," and certified that the warrant was served upon and translated for the petitioner in the Bronx. DE 7-1. In their response, counsel for respondents likewise stated that:

> ICE conducted query checks to positively identify the Petitioner, determined that he was not present in the United States with lawful status, and issued a Form I-200, Warrant for Arrest of Alien (the "Arrest Warrant") at approximately 5:50 p.m.

DE 7 at 1. All of these assertions would prove to be false.

*The Concepcion Arrest*

As part of the operation, ICE officers arrested Jeury Concepcion, a U.S. citizen. DE 8. The Concepcion arrest occurred at or about the same time, and on the same block, as the arrest of the petitioner. Tr. 113. As with the arrest of petitioner, officers claim that the Concepcion arrest was reportedly rooted in misidentification. According to the testimony of Katepodis, Concepcion was misidentified as Dario. Tr. 116. The

record contains a photo of Dario, the original target, as well as visual images of Concepcion.  A side-by-side comparison here is helpful:



*The Target: Dario Santos-Amarante from ICE Records*



*The Arrestee: U.S. citizen Jeury Concepcion, from news video.*

The Concepcion arrest was captured on several videos.  One shows the apprehension of Concepcion, which was extremely violent, and during which he sustained head injuries requiring stitches (seen in the above still image).[4]  The time stamp on the video suggests the Concepcion arrest happened at 5:53 p.m., a few minutes after the arrest of the petitioner.  Another reveals a masked ICE agent—gun drawn, held in a side grip and pointed at Concepcion—racing toward him.[5]  In the video, Concepcion appears to be walking toward a barber shop, seemingly unaware of the masked agent.

---

[4] Hernandez, *supra* note 3.

[5] Norwood News, *Federal Arrest on Hull Avenue, Norwood, May 6, 2026 V1* (YouTube, May 8, 2026), https://www.youtube.com/watch?v=pUutg4rLfN0&t=10s.


Camera1
ICE
05/06/2026 05:53:46 PM


Federal arrest on Hull Avenue, Norwood, May 6, 2026 V1
Camera1
ICE
05/06/2026 05:53:47 PM


Federal arrest on Hull Avenue, Norwood, May 6, 2026 V1
Camera1
ICE
05/06/2026 05:53:48 PM




*Still images from the video of the erroneous arrest of Concepcion, a United States citizen wrongly identified as a "target" by the same team that arrested the petitioner. Note that the ICE agent has his gun drawn and pointed at Concepcion in the fourth image.*

At the hearing, Katepodis attempted to distance himself from the arrest of Concepcion, stating "I don't see how this would be related to me." Tr. 114. Ultimately, Katepodis acknowledged—as it was undeniable—that he was the team leader for both arrests, he was "dealing" with the situation and, for a time, he and his team placed Concepcion and petitioner in the back seat of the same vehicle. Tr. 113–14. Important here, the video of Concepcion's arrest provides circumstantial evidence that ICE agents on Katepodis's team brandished firearms during their confrontation with petitioner.

*Katepodis's Post-Hearing Declaration*

Along with their post-hearing filings, respondents offer a declaration from Katepodis in which he tries to recant his hearing testimony by offering sworn statements that directly contradict the sworn testimony he gave before this Court. DE 22-1.

First, he states that he "incorrectly testified" regarding what database information was accessible onsite and states that the EARM system "was available to me and my team on our cellphones during the surveillance," which included the "height, weight and build" of the two targets. *Id.* ¶¶ 6–8. Thus, contrary to the testimony he offered at the hearing, Katepodis now claims that the information about "height, weight and build" was available to his team during the operation. *See* Tr. 94–95, 120, 125.

Katepodis further attempts to alter his sworn testimony that he was unaware of whether his supervisor had issued the warrant at the time of the arrest, by now stating that "it was [his] understanding that an I-200 warrant of arrest was issued" prior to the arrest. DE 22-1 ¶ 9. Again, this contradicts his testimony at the hearing, during which Katepodis testified that his supervisor told him "he was going to issue the I 200," acknowledged that he "didn't have the warrant yet" and had been "told that an I 200 was going to be issued." Tr. 102–03.

Finally, Katepodis tries to explain his apparent falsification of the warrant by certifying it was served by him in the Bronx, when service was made by someone else in Manhattan. Katepodis suggests that it "was my understanding that the certificate of service for the I-200 required the location of the arrest and where Petitioner was located at the time the I-200 was issued." *Id.* ¶10. This is largely irrelevant, as it is clear from the testimony that Katepodis had no idea when or whether the administrative arrest warrant was issued. Tr. 103. Furthermore, a misunderstanding of location of the service answers only part of the question: Katepodis certified under oath that the

warrant was "served by me at Bronx, New York on [Almonte] on May 6, 2026 *and the contents of this notice were read to him … in the Spanish language.*" DE 7-1 (emphasis added). Katepodis could not have read the document to petitioner in the Bronx—or anywhere else—because he did not have the document. Perhaps more troubling than any individual instance of altered testimony, ICE's team leader's limited understanding of the agency's procedures and legal requirements raises more questions than it answers.

Because of ICE's actions in this matter, petitioner was held in MDC until the bail hearing. Tr. 147.

**DISCUSSION**

The testimony and evidence received bears heavily on the resolution of the petition.

*Petitioner Was Not Lawfully Detained*

In their briefing, respondents principally focus their arguments on the complex parameters concerning proper sequencing of ICE charging instruments, *e.g.,* whether an NTA may be filed subsequent to the issuance of an administrative warrant. *See* DE 22 at 5–6. However, that discussion is a red herring. Respondents' contentions presuppose that petitioner was "arrested" only subsequent to his custodial interview with Katepodis, during which petitioner divulged that he was not legally in the country. Were that the case, then the appropriate sequencing of the charging instruments would

be quite material. But petitioner was detained far earlier—at latest, when he was tackled to the ground after the foot chase.

In other words, the time at which Katepodis advised petitioner that he had been arrested bears little relation to the point at which petitioner was actually arrested. By the time Katepodis spoke to his supervisor on the telephone, petitioner had already been tackled by ICE agents, handcuffed while prone and face down on the sidewalk, hoisted into a police vehicle, transported to a gas station where he was held, handcuffed, in the vehicle and subject to a custodial interrogation by Katepodis. *See California v. Hodari D.*, 499 U.S. 621, 624 (1991) (recognizing that "the mere grasping or application of physical force with lawful authority" is sufficient to constitute a common law arrest); *Torres v. Madrid*, 592 U.S. 306, 313 (2021) (same). Indeed, Katepodis acknowledges that following the foot chase, "we made [sic] detention or took custody of the petitioner," well before the point at which the Government argues the "arrest" occurred. Tr. 97–98.

That petitioner was first arrested when he was tackled to the ground—and not merely when he was informed of his self-evident detainment minutes later in an ICE van—matters a great deal. The only basis that respondents invoke to justify petitioner's detention is 8 U.S.C. § 1226(a), and "an executive agency, like ICE, is bound by the bases it used to justify its decision—here the arrest and detention—in the first instance, not reasons it comes up with afterwards." *Inestroza Carbajal v. Frazier*, No. 26-CV-2778 (SJB), 2026 WL 1309265, at *1 (E.D.N.Y. May 12, 2026); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22, 24 (2020) ("The basic rule here is clear: [a]n agency

must defend its actions based on the reasons it gave when it acted," and a decision will not be upheld based on "impermissible *post hoc* rationalization"). Respondents' attempts to characterize this as authorized detention under that provision are spurious, as §1226(a) concerns only arrests made "on a warrant issued by the Attorney General."

Any authority for the agents to effect an arrest prior to the issuance of an administrative warrant would derive from 8 U.S.C. § 1357. However, respondents did not cite §1357 in their briefing, nor could they in any event, since the ICE officers did not contemporaneously rely on that authority when detaining petitioner. The government "cannot create a post hoc rationalization for [a petitioner's] detention," and "to argue that [a petitioner] was detained under one statutory provision but may be continuously detained under another one . . . is exactly the kind of post hoc rationalization that the Supreme Court deemed impermissible." *Pastrana-Beltran v. Mullin*, No. 26-CV-2657 (RER), 2026 WL 1398609, at *2 (E.D.N.Y. May 19, 2026) (citing *Regents*, 591 U.S. at 21–24).

Even if respondents could invoke §1357, they would not prevail. That statute requires that agents have both reason to believe that "the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357.[6] As to petitioner, the ICE officers had not established petitioner's unlawful presence in the United States, nor

---

[6] At the hearing, Katepodis testified that awareness that an individual is undocumented, standing alone, provides a sufficient basis for an arrest by an immigration officer. Tr 126. Plainly, this is not the case.

even a reasonable suspicion of that fact, prior to taking petitioner into custody; indeed, the only such evidence that came into their possession were his statements made during the ensuing custodial interrogation subsequent to the unlawful apprehension.

Importantly, construing the agents' attempts to speak with or detain the petitioner as an investigatory stop rather than an arrest would not permit the agents to detain petitioner under either §1226(a) or §1357.

Federal law permits immigration officers to "interrogate and temporarily detain an alien upon circumstances creating a reasonable suspicion, not rising to the level of probable cause to arrest, that the individual so detained is illegally in this country." *Chi Yuan Chen v. Gonzales*, 224 F. App'x 116, 118 (2d Cir. 2007) (citing *Ojeda-Vinales v. INS*, 523 F.2d 286, 287 (2d Cir. 1975)). That standard, while less onerous than probable cause, still imposes the reasonable suspicion test established in *Terry v. Ohio*, 392 US 1, 22 (1968), under which any such stop must be "justified at its inception." 392 U.S. at 20. And the imposition of those guardrails is mandatory—"[t]o stop an individual for brief questioning about immigration status, the Government *must* have reasonable suspicion that the individual is illegally present in the United States." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 3 (2025) (Kavanaugh, J., concurring) (emphasis added).

Respondents suggest that their "misidentification" of petitioner as the target of their operation furnished them with reasonable, if incorrect, suspicion. *See* DE 22 at 6. However, ICE's narrative justifying arrests because of misidentification of the arrestee

as a "target" of an ICE operation has an inglorious history.[7] "This rationale has become so commonplace in cases involving ICE enforcement efforts that such testimony must be examined carefully." *Alfaro v. Mullin,* 2026 WL 734348 at *2 n.6. The sworn testimony presented by the ICE officers supporting identification of petitioner as the officers' planned target does not withstand scrutiny. Consequently, the Court rejects the officers' testimony that their attempts to detain petitioner flowed from an actual, good-faith misidentification of petitioner as an already extant target.[8]

With that justification discarded, respondents have no further basis with which to justify petitioner's detention. To begin, the ICE agents had no basis whatsoever to

---

7 *See, e.g., Flores v. Mullin*, No. CV 26-1855 (GRB), 2026 WL 948298, at *2 (E.D.N.Y. Apr. 8, 2026) (petitioner "matched the description of the targeted individual"); *Alfaro v. Mullin*, No. 26-0766 (GRB), 2026 WL 734348, at *2 (E.D.N.Y. Mar. 16, 2026)("Upon observing Petitioner, the officer believed that he 'did strongly resemble the target of the enforcement effort'"); *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326, 2026 WL 585130, at *1 ("ICE officers targeted Garcia Lanza for arrest simply because he looked like someone else for whom the agents were purportedly searching"); *Guardado v. Maldonado*, No. 26-CV-1170 (OEM), 2026 WL 670156, at *2 (E.D.N.Y. Mar. 10, 2026) (petitioner "matched the description of their primary target"); *Acuapan v. Bondi*, No. 26-CV-00384 (OEM), 2026 WL 507889, at *1 (E.D.N.Y. Feb. 24, 2026) ("Petitioner, an individual matching the target's description"); *Castellon v. Doe,* No. 26-CV-647 (NJC), 2026 WL 326947, at *4 (E.D.N.Y. Feb. 7, 2026) (officer "fails to provide the description of the target that agents were looking for"); *Sanchez Atz v. Noem*, No. 26-CV-00214 (OEM), ––– F.Supp.3d ––––, ––––, 2026 WL 320238, at *1 (E.D.N.Y. Feb. 6, 2026) ("they observed a male subject matching the physical description of the third-party target") *Ndoye v. Joyce*, No. 25-CV-8856 (VSB), 2026 WL 306387, at *8 (S.D.N.Y. Feb. 5, 2026) (unclear "whether he was the target in question"); *R.P.L. v. Maldonado,* 814 F.Supp.3d 301, 303 (E.D.N.Y. 2025) ("a records check confirmed that Petitioner was not their original target"); *Mejia v. Joyce*, No. 25-CV-10462 (LAK), 2025 WL 3719632, at *1 (S.D.N.Y. Dec. 23, 2025) ("Mistakenly believing that Mr. Mejia was their intended target ...").

8 Likewise, the Court rejects the ICE officers' testimony regarding drug transactions, which respondents did not repeat in the briefing.

approach petitioner and attempt to effectuate the initial *Terry* stop prior to his attempted flight. The agents' conduct is therefore invalid *ab initio*.

But even after petitioner's flight, a *Terry* stop would not be supported on these facts. It is well-established that "[w]ithout more, [ ] a suspect's attempt to flee the scene is not sufficient to establish probable cause." *Coggins v. County of Nassau*, 254 F. Supp. 3d 500, 516 (E.D.N.Y. 2017) (Bianco, J.). There is no "more" in this case. True, "a suspect's flight may, *under certain circumstances*, provide reasonable suspicion to warrant a *Terry* stop," *Jenkins v. City of New York*, 478 F.3d 76, 89 n.12 (2d Cir. 2007) (emphasis added), but "unprovoked flight alone is not enough to justify a *Terry* stop," *United States v. Mitchell*, No. 08-CR-775 (KAM), 2009 WL 1472834, at *10 (E.D.N.Y. May 27, 2009). While the Supreme Court has been clear that surrounding indicia such as "presence in an area of expected criminal activity" may when combined with flight supply law enforcement with reasonable suspicion for a *Terry* stop, *see Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and while such indicia may be broadly employed by immigration officials to establish reasonable suspicion, *see Vasquez Perdomo*, 146 S. Ct. at 3 (Kavanaugh, J., concurring) (enumerating factors), the ICE officers here provided no further justification beyond their rejected misidentification theory. In such circumstances, the stop was necessarily based solely on flight and is invalid under the analysis in *Mitchell*.

Petitioner's detention was therefore invalid even if the agents' initial contact (whether prior or subsequent to petitioner's flight) is construed as a *Terry* stop.

Ultimately, petitioner's detention is clearly unlawful under §1226(a) and would similarly be unlawful under §1357, had respondents cited it.

*The Falsified Warrant and Post-Hoc Paperwork*

Although not material to the legal analysis in this action because petitioner's detention occurred long before the custodial interview Katepodis conducted, the Court notes that subsequent to petitioner's detention, ICE agents prepared a substantially false administrative warrant in an attempt to rationalize their actions. The warrant purports to establish "probable cause to believe that [Almonte] is removable from the United States . . . based upon biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate . . . that the subject . . . lacks immigration status." DE 7-1. The claim that database queries checks could "positively identify" petitioner appears spurious as, without any immigration record, petitioner would not appear in any ICE database from which he could be positively identified.[9]

After the Court required a further submission to explain this incongruity, respondents submitted an affidavit from Brenden Cuni, a Supervisory Detention and Deportation Officer with ICE, who was responsible for conducting the background searches. DE 20-7. Cuni was notified "some time before 5:50 PM" that "Petitioner was

---

[9] The same could well be true of a U.S. citizen. *Alfaro v. Mullin*, No. 26-0766 (GRB), 2026 WL 734348, at *4 (E.D.N.Y. Mar. 16, 2026) (one officer testified that such treatment would equally apply to citizens, who would be arrested unless able to prove their citizenship by always carrying proof of citizenship, having a passport appear on a records check or convincing the officer that they were U.S. citizens.").

detained." *Id.* ¶3. He searched five separate federal databases, all of which "yielded *negative* results." *Id.* ¶5 (emphasis added). Cuni then "issued and signed the I-200, Warrant of Arrest, and checked off the boxes relating to 'biometric confirmation of the subject's identity and a records check of federal databases . . . .'" *Id.* Of course, since the records checks were negative, it was undeniably false, though represented as true in the warrant, that "biometric confirmation [and] records check of federal databases *affirmatively* indicate" that the petitioner lacked immigration status. DE 7-1. Cuni explains that ICE then processed the petitioner, and in so doing, entered his data into those various databases. After processing (and after the warrant was signed and executed), Cuni ordered another officer to run "a second records check of the electronic federal databases, *which then yielded positive results* . . . because Petitioner's information was now part of the system." DE 20-7 ¶7 (emphasis added).

So, the thought is that after issuing a fraudulent arrest warrant stating that petitioner's information was part of the system when it was not and indicating that he could be biometrically identified even though they had not collected the information to make a positive match, Cuni attempted to reconcile these falsehoods by subsequently collecting the information, adding it to those systems and, after issuing the warrant, searching the databases again to "find" him.[10]

---

[10] This is not the only matter in which a declaration by SDDO Cuni presented difficulties. *Fabian Chaglla v. Maldonado*, No. 26-CV-4308 (BMC), 2026 WL 2529494, at *1 (E.D.N.Y. Aug. 27, 2026) ("Not long after SDDO Cuni's declaration was filed, a video of the arrest from a nearby doorbell camera surfaced, and the footage largely contradicts SDDO Cuni's declaration.")

Some things simply strain the imagination.

Equally concerning is the sworn "Certificate of Service" completed by Katepodis, which he admitted was false. Tr. 106. Katepodis's effort to change this testimony by filing a declaration is unpersuasive.[11]

Both sets of misrepresentations, while technically immaterial as to the merits of the petition, raise serious questions regarding ICE's practices and procedures generally.

*Exhaustion of Administrative Remedies*

In the alternative, respondents argue that petitioner has failed to exhaust administrative remedies and is thus barred from seeking habeas relief. On this point, the Court adopts a holding by Judge Gonzales:

> It is well-settled that Petitioner "is not required to exhaust a process that was deficient from the outset." *Gopie*, 2025 WL 3167130, at *3. Nevertheless, because courts may excuse exhaustion when a petitioner has raised a substantial constitutional question, the Court excuses exhaustion—if any were required—because Petitioner has raised such a constitutional question. *See Arango v. Genalo*, No. 25-cv-6720, 2025 WL 3637500, at *3 (E.D.N.Y. Dec. 16, 2025).

*Curimilma Quille v. Blanche*, No. 26-CV-2818 (HG), 2026 WL 1453889, at *5 (E.D.N.Y. May 22, 2026. Thus, failure to exhaust does not preclude habeas relief, and this Court excuses any failure in light of the substantial questions raised.

---

11 As noted, the illegality of the initial detention renders the warrant's substance immaterial as to the legal analysis here. But if the validity of the warrant were at issue, the sequencing would render it void. *See Sanchez Alfaro*, 2026 WL 1142478, at *2 ("The officers openly admitted that they arrested the wrong man and that the administrative arrest warrant and related NTA were issued after the arrest in question. Such post-hoc documentation does not cure the illegal arrest and detention.").

*Issuance of the Writ and Further Considerations*

For the reasons discussed, as petitioner has sufficiently challenged the legality of his arrest and detention, and respondents offer nothing substantial in response, the petition is hereby GRANTED.

The evidence raises substantially greater concerns reminiscent of earlier decisions issued by the undersigned. In one such case, the Court observed:

> the evidence highlights a more systemic concern: the officers who testified – all sworn to uphold the law – proved unaware of and oblivious to the requirements of the law. Their authority to effect arrests is predicated upon "successful complet[ion of] basic immigration law enforcement training." 8 C.F.R. § 287.5 (c) (1). [ ] The combination of the officers' lack of training and preparation and the extraordinary pressure to exponentially increase the number of immigration arrests results in a proverbial recipe for disaster. The byproduct is as unfortunate as it was foreseeable: arrest and detention practices that violate the law, regulations and Constitution of the United States. [ ]
>
> In decision after decision, judges have called out illegal practices by ICE. And yet the officers who testified here revealed an astonishing lack of awareness of their duties under the law, while ICE has seemingly developed workaday procedures that fail to account for legal requirements. Law enforcement officers cannot uphold laws of which they are unaware or do not understand.

*Alfaro v. Mullin*, 831 F. Supp. 3d 177, 185 (E.D.N.Y. *2026), clarified on denial of reconsideration sub nom. Sanchez Alfaro v. Mullin*, No. CV 26-0766 (GRB), 2026 WL 1142478 (E.D.N.Y. Apr. 27, 2026). The factual record here raises many of the same concerns.

Several elements of this case, however, extend beyond the circumstances in *Sanchez Alfaro*, in which the Court found that "[u]ltimately, responsibility does not lie at the doorstep of the officers who testified." *Id.*

The evidence points to numerous failings on the part of both ICE and the officers who testified, including:

1. evasive and apparently perjurious testimony by the ICE agents, including the testimony concerning supposed observations of the petitioner engaging in drug transactions, which bear all the hallmarks of coordinated fabrication,[12]

   the absence of any recovered drugs, paraphernalia or cash from the petitioner, the failure of the agents to follow up upon these supposed observations or refer the matter to another law enforcement agency, and the notable absence of any reference to these observations in the voluminous documentary records, further undermining the agents' testimony;
2. the seemingly reflexive, though false, claims that the petitioner was "misidentified" as the target of the operation;
3. fundamental misconceptions about ICE agents' authorities and duties;
4. illegality of the arrest and detention of petitioner and Concepcion;
5. the post-arrest documents, which not only were procedurally and legally suspect, but contain false statements;

---

[12] Notably, in its filings, Government counsel has not referenced this testimony, seemingly abandoning any argument predicated upon these sworn assertions by the agents.

6. the database search process used to justify the administrative warrant, as described by the ranking supervisory officer, which appears designed to generate misleading information in official records; and
7. the inexperience of the agents involved, their woeful lack of proper training, understanding of law, policies and procedures, and their ready recourse to false testimony to conceal these failings.

Some of these failings fall within this Court's powers to impose sanctions, to refer these matters for further action by other authorities and/or to exercise its contempt powers. Before the Court considers invoking that authority, it will provide respondents with an opportunity to address the concerns raised above and, if they so choose, propose investigatory, operational and/or disciplinary measures to remediate these apparent violations. *Alfaro*, 831 F. Supp. 3d at 186 ("Respondents, charged with enforcing the laws of this nation, cannot ignore the scores of decisions which they have unsuccessfully litigated before this Court and others, without taking action to ensure that their agents and agencies are not acting in contravention of the law.") Should respondents fail to propose and carry out sufficient measures, the Court will consider further action.

Once again, "[i]t is this Court's earnest hope that, as in other recent litigation, respondents will endeavor to responsibly resolve operational issues on their own initiative." *Sanchez Alfaro*, 2026 WL 1142478, at *9.

**CONCLUSION**

Based on the foregoing, it is hereby Ordered as follows:

1. The petition is granted provisionally pending further proceedings described herein;

2. Within 21 days of the date of this Order, Respondents are to advise this Court of the steps that will be taken, if any, to ensure that future ICE enforcement actions shall be conducted in a lawful manner, and that proper training, policies and procedures are in place and effectively communicated to ensure lawful conduct by their agents; and

3. Within that same period, respondents will advise the Court as to what actions, if any, they propose relating to the concerns raised herein.

4. After receipt of the response by respondents, the Court will consider whether additional proceedings are required in this case.

5. Any application for attorney's fees and costs under the Equal Access to Justice Act shall await the conclusion of the proceedings in this matter.

Dated: October 5, 2026
Central Islip, New York

SO ORDERED.

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge